IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHNSON HEALTH TECH NORTH
AMERICA, INC.,

                              Plaintiff,                          OPINION AND ORDER

        v.                                                        17-cv-834-wmc

GROW FITNESS GROUP, INC. a/k/a
GROW FITNESS, INC., and MATTHEW
SEABERG,

                              Defendants.

In this civil action, plaintiff Johnson Health Tech North America, Inc., asserts various state law claims for failure to honor the terms of a promissory note and related personal guaranty. Before the court is plaintiff's motion for partial summary judgment, seeking judgment in its favor against individual defendant Matthew Seaberg on plaintiff's claim for breach of his personal guaranty. (Dkt. #42.)[1] Finding that plaintiff has established each of the elements of that claim beyond any reasonable dispute, and that defendant has failed to put forth sufficient evidence from which a reasonable jury could find either duress or unconscionability, the court will grant plaintiff's motion for judgment as to liability. The court will also schedule a telephonic conference to determine next steps in light of entry of partial summary judgment, including (1) plaintiff's plan to prove up damages, (2) whether plaintiff wishes to pursue other claims asserted against Seaberg, and

---

[1] Also before the court is defendant Seaberg's motion for leave to file a sur-reply. (Dkt. #64.) While Seaberg fails to provide a valid basis for filing a sur-reply -- the argument and case citations contained in his proposed brief could have been provided in his opposition -- the court will grant the motion nonetheless in an effort to consider *all* possible arguments in opposition to plaintiff's motion. Accordingly, the court has considered Seaberg's proposed sur-reply, as well as plaintiff's opposition to this filing.

(3) whether plaintiff wishes to renew its motion for default judgment against corporate defendant Grow Fitness Group, Inc. a/k/a Grow Fitness, Inc..

UNDISPUTED FACTS[2]

**A. Overview of the Parties**

Plaintiff Johnson Health Tech North America, Inc. ("JHTNA"), is a Wisconsin corporation with its principal place of business in this state. JHTNA specializes in the design, production and marketing of fitness equipment and machines.

Defendant Grow Fitness Group, Inc., which sometimes held itself out as Grow Fitness, Inc., was a Florida corporation with its principal place of business located in Ocoee, Florida. Plaintiff claims without contradiction that these are identical entities with no substantive difference, other than the addition of the word "Group" in one of the names. Accordingly, the court will refer to this entity or entities as "Grow Fitness," although neither answered the complaint or otherwise entered an appearance and default as to liability has already been entered by the Clerk of Court against the collective entity, Grow Fitness. (Dkt. #10.) Grow Fitness sold fitness equipment, fitness flooring and fitness business solutions. Defendant Matthew Seaberg was the owner and president of Grow Fitness. He is also domiciled in Florida.

---

[2] Defendant Seaberg failed to comply with this court's guidelines for summary judgment and did not respond to plaintiff's undisputed facts. Still, given his *pro se* status, the court has considered his summary judgment submission, as well as his amended answer, and noted any relevant disputes. The court, therefore, finds the following facts undisputed and material unless otherwise noted.

## B. Seaberg's Experience in the Fitness Equipment Industry

Defendant Seaberg worked in the fitness equipment industry for approximately five to seven years and testified at his deposition that "the gym business, selling gym equipment" is "all [he has] ever known." (Def.'s PFOFs (dkt. #48) ¶ 9 (quoting Seaberg 7/29/19 Dep. (dkt. #45) 43).) Prior to 2014, Seaberg and a business partner formed an entity named Grow Development Group, Inc., which is not the corporate defendant in this lawsuit. Grow Development sold JHTNA machines (for example, treadmills). Indeed, Seaberg acknowledged that JHTNA's machines were Grow Development's "main bread and butter." (*Id.* ¶ 12 (quoting Seaberg 7/29/19 Dep. (dkt. #45) 63).) At some point, Seaberg took over his partner's interest in that business, becoming the sole owner. However, Grow Development began to have issues paying JHTNA for the machines it resold to its customers, resulting in Grow Development incurring a significant amount of debt.

In 2014, Seaberg formed defendant Grow Fitness.[3] The debt that Grow Development owed to JHTNA was then undertaken by Grow Fitness, which became a dealer for JHTNA. Plaintiff even submits an unsigned, commercial dealership agreement as governing this relationship. Defendant Seaberg disputes whether the terms of this agreement are controlling, but does not dispute that Grow Fitness was a dealer for JHTNA. (Pl.'s PFOFS (dkt. #48) ¶ 17 (citing Seaberg's Am. Answ. (dkt. #34) 3 at ¶ 9.) Regardless, as explained in the opinion below, plaintiff's claims do *not* turn on Grow Fitness's status as

---

[3] Seaberg argues in his brief that the creation of this new entity was JHTNA's idea, though offers no support for this contention. Regardless, the court will consider this alleged fact in the discussion below as to his defenses of duress and unconscionability.

a dealer for JHTNA.  Instead, plaintiff asserts claims for (1) breach of the promissory note by the corporate defendant Grow Fitness and (2) breach of the guaranty on that note by Seaberg, the latter of which is the subject of the present motion.

As a dealer, Grow Fitness continued to purchase new fitness machines from JHTNA at dealer prices and on credit; in turn, Grow Fitness would offer those machines for sale to its customers.  Ultimately, "Grow Fitness was supposed to sell the equipment it had purchased to customers and then use the money obtained from those sales to pay for the equipment previously purchased and to purchase additional equipment as needed." (*Id.* ¶ 19 (quoting Compl. (dkt. #1) ¶ 15; Seaberg's Am. Answ. (dkt. #34) 3 (providing no answer to ¶ 15 because he does not dispute it).)

Even though Seaberg testified that nothing restricted Grow Fitness to only selling JHTNA machines, Seaberg made the decision to sell only JHTNA machines because he believed he "could sell a ton of" them.  (*Id.* ¶ 20 (quoting Seaberg's 7/29/19 Dep. (dkt. #45) 67-68, 73).)  Seaberg also acknowledged in his deposition that this approach of only selling one type of fitness equipment was not common in the fitness equipment business, as most businesses sell equipment from more than one fitness company.

## C. Promissory Note, Security Agreement and Personal Guaranty

In September 2014, Seaberg, on behalf of Grow Fitness, executed a secured promissory note for $501,929.33 in favor of JHTNA (the "Note").  (Draves Decl., Ex. A

(dkt. #44-1).)[4]  Seaberg admitted that he signed the Note in his amended answer, though he claims that he did so "under duress," that he was "coerced," and that the terms were "unfair."  (Seaberg's Am. Answ. (dkt. #34) 3-4, ¶ 17.)  The court addresses each of those defenses in the opinion below.  Seaberg also challenges the Note itself, asserting that it was not dated, JHTNA did not sign it, and the original has not been produced.  The court also addresses those arguments below.

The Note provides that it is "delivered in consideration of the outstanding Accounts Receivable Invoices as of the date hereof between Maker [defined as Grow Fitness] and Holder [defined as JHTNA] and Guarantor and Holder and Holder's agreement to finance the sale by Grow Fitness . . . to Maker of certain Matrix equipment."  (Draves Decl., Ex. A (dkt. #44-1) 2.)  The Note further provides that (1) payments are to be made according to the "amortization schedule attached as Exhibit A," and (2) "[a]ll payments hereunder shall be applied first against any accrued and unpaid interest, and then against unpaid principle."  (*Id.*)  Exhibit A to the Note contains a payment plan describing payments from

---

[4] During his deposition, Seaberg acknowledged that the signature on the Note looked like his signature, but stopped short of fully admitting that he signed it.  This testimony is illustrative of Seaberg's abuse of the deposition process, by (1) repeatedly refusing to answer straight-forward questions, (2) claiming that he could not recall basic information, and (3) generally refusing to engage in a meaningful, productive exchange.  (*See, e.g.*, Seaberg 7/29/19 Dep. (dkt. #34) 36 (Q Okay.  So you define duress as being short for time and/or traveling?  A No.  Q Then how do you define duress?  A (No response.)  Q What do you mean by duress, that you were under duress?  A I don't know how to explain it.  Q What do you mean by duress?  A (No response.); *id.* at 51 ("Q . . . So let's take a treadmill.  How much would an average treadmill sell for?  A Depends on who -- where you're selling it, what market.  Q Let's say Florida.  A Okay.  What channel -- what market are you selling it to in Florida?  Q What channels are there?  A You tell me."); *id.* at 75 ("Q And did you agree to any sort of payment plan?  A I can't answer that question.  Q Why can't you?  A Nothing was upheld.  There was no -- like, there was no -- nothing was executed.").)  Seaberg also complained about the length of the deposition and its extension into a second day, but this was largely due to his own actions.  Seaberg's performance during his deposition casts doubt on whether the court's decision to grant him leave to amend his original answer was justified.

October 2014 through September 2017.  Finally, the Note defines the rate of interest as "six percent (6%) per annum."  (*Id.*)

On September 19, 2014, Seaberg confirmed by email to JHTNA's Corporate Controller Christine Draves that he received the Note, and "thank[ed] [her] for everything."  (Draves Decl., Ex. B (dkt. #44-2).)  On October 3, 2014, Seaberg emailed Draves the executed Note.  (*Id.*, Ex. C (dkt. #44-3).)

The Note was secured by a General Business Security Agreement, whereby Grow Fitness granted JHTNA a security interest in its assets.  (*Id.*, Ex. D (dkt. #44-4).)  The Security Agreement was also executed by Seaberg, on behalf of Grow Fitness.  JHTNA perfected its security interest in the assets of Grow Fitness by filing Uniform Commercial Code ("UCC") financing statements with the Florida Secretary of State on October 3, 2014, as document number 201402319000, and on June 1, 2017, as document 201701389604.  (*Id.*, Ex. E (dkt. #44-5).)

Finally, Seaberg executed a personal guaranty (the "Guaranty").  (Draves Decl., Ex. F (dkt. #44-6).)  In response to requests for admission, Seaberg admitted that he signed the Guaranty, although he claims to have done so under duress.  (Pl.'s PFOFs (dkt. #48) ¶ 31 (citing Zielke Decl., Exs. A, B (dkt. ##43-1, 43-2)).)  On October 3, 2014, Seaberg emailed Draves the executed Guaranty.  (Draves Decl., Ex. C (dkt. #44-3).)  The Guaranty provides in pertinent part:

> For good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, and as an inducement for Johnson Health Tech North America, Inc. ("Creditor"), to agree to finance the sales of Grow Fitness, Inc. ("Debtor") of certain Matrix and Magnum equipment and to accept installment payments of a sum currently due from

> Debtor to Creditor in the principal sum of $501,929.33,
> Matthew Seaberg ("Guarantor") does hereby guaranty to
> creditor the prompt, punctual and full payment of all monies
> now or hereinafter due Creditor under the Secured Promissory
> Note between Debtor and Creditor, dated September __, 2014
> in the principal sum of $501,929.33.

(Draves Decl., Ex. F (dkt. #44-6).)


### D. Grow Fitness's Failure to Make Payments

In October, November and December 2014, Grow Fitness made payments to JHTNA due under the Note in the amounts set forth in the payment plan attached as Exhibit A to the Note. (Draves Decl., Ex. G (dkt. #44-7) (statement of payments).) In 2015, however, Grow Fitness made *no* payments in January through April, then it began making monthly payments again, although not in the required amounts. The statement of payments shows what portion of the payment was applied to principal as compared to interest.

On October 15, 2015, Draves emailed Seaberg inquiring about payments on the Note:

> Matt -- Where are you with reviewing your financials to make
> some headway on the note payable? As of the end of Sept the
> balance is $460,515.26, based on the original agreement you
> [are] over $100K behind on payments.

(Draves Decl., Ex. H (dkt. #44-8).) Seaberg responded that same day, "Can I call you tomorrow to discuss the progress we are making." (*Id.*) On November 11, 2015, Draves emailed Seaberg again, inquiring about payments on the Note:

> We still need to firm up regular payment amounts to apply

> toward the [Note].  There was no payment made in October[5]
> and we are half way through Nov.  With the SBA loan please
> confirm the intended amount to be applied towards the [Note]
> so we can revise the regular payment[] amounts remaining on
> the [Note] so it is fully paid by Sept 2017.

(*Id.*, Ex. I (dkt. #44-9).)  Seaberg responded that he would send the information to her next week and give her a call.  Ultimately, Grow Fitness made only one payment to JHTNA in October of 2016.

Following Grow Fitness's failure to make the additional, required payments on the Note, JHTNA and Grow Fitness entered into an Independent Sales Agreement, which provided in pertinent part:

> JHTNA will be solely responsible for approving credit terms of
> customers, invoicing customers and collecting payments.
> Profit Allocation Settlement will occur once the customer has
> fully paid for product.  JHTNA will review orders and quotes
> for completeness so that all orders of a single customer are
> consolidated into a single profit allocation.  JHTNA will remit
> via ACH transactions based on the agreed to structure and
> apply the residual profit to the past due amount in which Grow
> [Fitness] owes JHTNA in the following order:  First to accrued
> interest on Note Receivable, Second to Note Receivable
> amount in default, Third to oldest outstanding AR balance.

(*Id.*, Ex K (dkt. #44-11).)  Consistent with this agreement, JHTNA applied part of Grow Fitness's commissions to the amount due under the Note in 2017.  (*See id.*, Ex. G (dkt. #44-7) (statement of payments listing 2017 payments as "applied commission - back interest then princip[al]").)

---

[5] The statement of payments shows a payment of $7,500 in October 2015.  The court assumes that this amount was recognized after the November 11, 2015, email -- perhaps in response to Draves' question about how to allocate the SBA loan proceeds.  While there is some uncertainty, it does not appear to be material given that plaintiff is giving Seaberg credit for an October 2015 payment.

On or around June 28, 2017, however, JHTNA sent Seaberg and Grow Fitness a notice of "Grow Fitness's failure to make full and punctual payment of amounts due under the Note, and JHTNA's demand for payment of past-due amounts." (Draves Decl., Ex. J (dkt. #44-10).) As of the date of the notice, JHTNA represented that the total amount due was $492,130.00. The notice also referenced Seaberg's personal guaranty, stating that it reserved the right "to obtain a money judgment against Grow Fitness and against Mr. Seaberg for his obligations under his Personal Guaranty." (*Id.*) JHTNA provided Grow Fitness with ten days to cure the default. Neither Grow Fitness nor Seaberg cured the default.

### E. Procedural Posture

JHTNA filed the present action on November 2, 2017. Defendant Seaberg, proceeding *pro se*, answered the complaint on December 4, 2017, in which he admitted the core allegations, including that Grow Fitness had executed the Note at issue; Seaberg executed the Guaranty; Grow Fitness failed to pay the money owed under the Note; and Seaberg failed to honor the Guaranty and pay the amount due. (Seaberg's Original Answ. (dkt. #6).) In response, plaintiff filed a motion for judgment on the pleadings. (Dkt. #11.) Before Seaberg's opposition to that motion was due, however, he filed for a petition for bankruptcy under Chapter 7 in the Middle District of Florida. (Dkt. #12-1.) This action was then stayed pending resolution of Seaberg's bankruptcy petition.

On November 6, 2018, Seaberg filed a waiver of discharge, which the bankruptcy court granted on November 9, 2018. (Pl.'s Mot for Scheduling Conf., Exs. A, B (dkt. ##20-1, 20-2).) Seaberg did not discharge any of his debts as a result of this proceeding.

On December 6, 2018, the court then reopened the case, and on June 13, 2019, the court granted Seaberg leave to amend his answer to deny several of the core allegations he had admitted in his original answer and denied as moot the motion for judgment on the pleadings. (Dkt. #33.) The case is now before the court on plaintiff's motion for summary judgment.

## OPINION

In its complaint, JHTNA alleges a number of state law claims against Grow Fitness and Seaberg, including tort claims for conversion, fraudulent misrepresentation and negligent misrepresentation. In its motion for summary judgment, however, JHTNA only seeks judgment in its favor against Seaberg on its breach of personal guaranty claim.[6] A party seeking summary judgment on a claim for which it bears the burden of proof "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

## I. Elements of Breach of Guaranty Claim

Because "[a] guaranty is a contract," *Dewitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship*, 2004 WI 92, ¶ 44, 273 Wis. 2d 577, 682 N.W.2d 839, the court

---

[6] As describe above, the clerk has entered a default against Grow Fitness. Plaintiff previously moved for default judgment against that defendant (dkt. #16), but in light of the ongoing claim against Seaberg, the court denied that motion without prejudice to plaintiff renewing it when entry of judgment against Grow Fitness would be appropriate (dkt. #54).

considers the familiar elements of a breach of contract claim in evaluating plaintiff's motion

for summary judgment on its claim for breach of Seaberg's personal guaranty.[7]  To prove

a breach of contract claim, a plaintiff must show: "(1) a contract between the plaintiff and

the defendant that creates obligations flowing from the defendant to the plaintiff; (2)

failure of the defendant to do what it undertook to do; and (3) damages."  *Brew City*

*Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 714

N.W.2d 582, *aff'd sub nom.*, 2006 WI 128, ¶ 11, 297 Wis. 2d 606, 724 N.W.2d 879 (citing

*Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200, 203 (1971)).[8]

---

[7] Plaintiff relies on Wisconsin law in support of its claim. Given that plaintiff is located in Wisconsin, defendant Seaberg directed the Note and Guaranty to JHTNA in Wisconsin and submitted some payments to JHTNA as required under the Note, it appears likely that Wisconsin law governs plaintiff's claims.  *See State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶ 51, 251 Wis. 2d 561, 641 N.W.2d 662 ("The first rule in Wisconsin choice of law rules is that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance.") (internal quotation marks and citation omitted).  Moreover, the Note provides that it "shall be governed by, and construed in accordance with, the internal laws of the State of Wisconsin, without regard to its conflicts of law principles."  (Draves Dec., Ex. A (dkt. #44-1).)  Nonetheless, because of Seaberg's domicile of Florida and the fact that it appears he signed the Note and Guaranty in Florida, there is a possibility that Florida law may govern plaintiff's claims.  When there is no outcome-determinative difference between two bodies of law, however, it is unnecessary to engage in a choice of law analysis.  *See Glaeske v. Shaw*, 2003 WI App 71, ¶ 21, 261 Wis. 2d 549, 562, 661 N.W.2d 420, 427 (2003).  Florida, like Wisconsin, treats a guaranty as a contract, *Texaco, Inc. v. Giltak Corp.*, 492 So. 2d 812, 814 (Fla. Dist. Ct. App. 1986); Florida also has the same elements of a breach of contract claim as Wisconsin, *see Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017); and the defenses of duress and unconscionability have similar elements under Florida law as under Wisconsin law, *see Alamo-Cruz v. Evanston Ins. Co.*, No. 17-60671-CIV, 2019 WL 3531512, at *5 (S.D. Fla. Aug. 2, 2019) (describing elements of duress under Florida law); *Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1368 (S.D. Fla. 2018) (setting forth elements of unconscionability defense).  Accordingly, the court will apply Wisconsin law to evaluate plaintiff's breach of guaranty claim.

[8] Technically, plaintiff need not demonstrate damages to prove *liability* in a contract case; all that needs to be shown is a breach.  *See Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995) (applying Wisconsin law) ("Proof of liability is complete when the breach of contract is shown."); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990) (applying Wisconsin law); *Vasselos v. Greek Orthodox Cmty. of St. Spyridon*, 24 Wis. 2d 376, 379, 129 N.W.2d 243, 245 (1964) (upholding finding of liability in breach of contract case where

## A. Enforceable Contract

As for the first requirement, plaintiff must demonstrate the elements of an enforceable contract -- offer, acceptance and consideration. *See Runzheimer Int'l, Ltd. v. Friedlen*, 2015 WI 45, ¶ 20, 362 Wis. 2d 100, 862 N.W.2d 879. The undisputed record demonstrates that in an attempt to address Grow Fitness's outstanding debt and allow it to continue to operate as a dealer, plaintiff offered defendants the terms of a payment plan as set forth in the Promissory Note and secured by Seaberg's Personal Guaranty. Seaberg accepted these terms by signing both. As for consideration, in exchange for defendants' promises as set forth in those documents, JHTNA continued to finance the sales of equipment by Grow Fitness, as well as agreed to forebear and accept installment payments on the ongoing debt owed it.

Nevertheless, Seaberg posits three, core challenges to the validity of this seemingly enforceable contract. *First*, Seaberg points out that neither document is signed by JHTNA, and further argues that to be "legally binding," the documents must be signed by both parties. (Seaberg's Opp'n (dkt. #60) 4.) Tellingly, Seaberg cites no legal support for this argument, likely because none exists. Instead, as plaintiff points out in its reply brief, Wisconsin law only requires the person *who is obligated to act* under the contract to sign it. *See* Wis. Stat. § 241.02(1) (setting forth which agreements must be in writing and "subscribed by the party charged"); *Cheney v. Cook*, 7 Wis. 413, 423–24 (1859) (rejecting argument that "the court ought not to enforce the performance of this contract, because it

---

plaintiff could at most prove nominal damages). However, there is no dispute that plaintiff has put forth sufficient evidence of damages here, even if the exact amount is uncertain.

is not signed by both parties," explaining that it is "well settled under the authorities that a contract signed by only one party as against the party who signs it[] will be enforced in equity as well as at law").

*Second*, Seaberg challenges the enforceability of the Note and Guaranty based on plaintiff's failure to deliver fully-executed copies. To the extent this argument rests on his position that JHTNA was obligated to sign the documents, the court rejects it for the reasons explained above. In his sur-reply, however, Seaberg doubles down on the argument that JHTNA was obligated to *produce* the "original, wet-ink versions." (Seaberg's Sur-Reply (dkt. #65) 1.) This assertion fails both as a matter of fact and of law. As to the facts, Seaberg provided JHTNA with a copy of both documents by email. As such, any originals are in *his* possession. As to the law, Federal Rule of Evidence 1003 provides that a "duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit a duplicate."

Here, Seaberg fails to offer *any* basis to challenge the authenticity of the Note and Guaranty submitted by plaintiff. While Seaberg claims that he acted under duress, he admitted to signing these documents. (Seaberg's Am. Answ. (dkt. #34) 3-4, ¶ 17 (admitting that he signed the Note); Zielke Decl., Exs. A, B (dkt. ##43-1, 43-2) (admitting that he signed the Guaranty).) In his sur-reply, Seaberg cites caselaw in support of his argument that plaintiff is obligated to produce the original, wet-ink versions of the Note and Guaranty, but these cases all involve mortgage foreclosure actions where the note was "endorsed in blank," making it incumbent on the holder of the Note to produce the original

(or otherwise demonstrate that it is in possession of the original).  (*See* Seaberg's Sur-Reply (dkt. #65) 1-2 (citing *Fed. Nat'l Mortg. Ass'n v. Thompson*, 2018 WI 57, ¶ 53, 381 Wis. 2d 609, 912 N.W.2d 364 (concerning "a promissory note endorsed in blank"); *Bank of Am. N.A. v. Minkov*, 2013 WI App 115, ¶ 6, 350 Wis. 2d 507, 838 N.W.2d 137 (considering mortgage note "endorsed in blank"); *Bank of New York Mellon v. Harrop*, 2016 WI App 34, ¶ 1, 369 Wis. 2d 71, 879 N.W.2d 808 (considering foreclosure action where another bank "endorsed the note in blank to" the plaintiff bank)).)  In contrast to those cases, the Note here expressly identifies JHTNA as the holder, just as the Guaranty identifies JHTNA as the creditor.

*Third*, Seaberg challenges the Guaranty on the basis that it is missing a date and the signature of a witness.  (Seaberg's Opp'n (dkt. #60) 4.)  The Guaranty, however, *is* dated *and* Seaberg's wife *signed it as a witness*:

Signed this __3__ day of __Oct__, 2014.             GUARANTOR:

In the presence of:

___Seary Seaberg___                                   ___Matthew Seaberg___
Witness                                               Matthew Seaberg, Individually

(Draves Decl., Ex. F (dkt. #44-6).)  Perhaps, Seaberg intended to challenge the Note itself for the lack of a date and signature of a witness, having only been dated "September __, 2014," with the day left blank, apparently because Seaberg failed to fill it in.  Regardless, Seaberg points to no support, nor could this court identify any cases or statute requiring a

contract to be dated or signed by a witness to be enforceable. Moreover, Seaberg *admitted* that he signed the Note and that he emailed it to Draves on October 3, 2014.

Having rejected Seaberg's various challenges, the court concludes that plaintiff has established an enforceable contract.

## B. Breach

Next, plaintiff must demonstrate a "failure of the defendant to do what it undertook to do." *Brew City Redevelopment Grp.*, 2006 WI App 39, ¶ 11. Here, there is no dispute that Grow Fitness failed to make all of the payments required under the Note and that Seaberg failed to honor the terms of the Guaranty. As such, the court concludes that plaintiff has demonstrated this element as well.

## C. Damages

Finally, in order to be awarded damages, plaintiff must demonstrate the amount Seaberg owes under the Guaranty. In its proposed findings, plaintiff's Corporate Controller Christine Draves, represents that as of April 20, 2018 -- more than a year and a half ago -- the total outstanding balance on the Note was $476,198.49 with interest continuing to accrue at a rate of 6% per year. However, this amount is obviously not current; moreover, the statement of payments appears to show an April 2018 ending balance of $452,079.70. (Draves Decl., Ex. G (dkt. #44-7).) In his opposition, Seaberg also challenges how certain payments were allotted, namely the "payments" that were allocated from Seaberg's commission under the parties' Independent Sales Agreement.

Thus, the *fact* that plaintiff was damaged by Seaberg's breach is established beyond reasonable dispute on this record, while the *amount* of damages has yet to be ascertained. The court will address how best to arrive at that number during the telephonic conference set in the order below.

## II. Affirmative Defenses

Plaintiff also seeks summary judgment on two defenses Seaberg has raised, although he did not formally plead either in his amended complaint. An affirmative defense "limits or excuses a defendant's liability even if the plaintiff establishes a prima facie case." *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (citing *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 n.9 (7th Cir. 2005)). "In other words, an affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true.'" *Id.* (citing Defense, Black's Law Dictionary (10th ed. 2014)).

As for these defenses, Seaberg has the burden of proof. *See Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 30, 290 Wis. 2d 514, 714 N.W.2d 155 ("[A] party seeking to invalidate a provision in a contract . . . has the burden of proving facts that justify a court's reaching the legal conclusion that the provision is invalid."); *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 535 (7th Cir. 2011) (explaining that unconscionability is an affirmative defense); *Park Bank v. Westburg*, 2013 WI 57, ¶ 28, 348 Wis. 2d 409, 832 N.W.2d 539 (recognizing economic duress as an affirmative defense). Because plaintiff is moving for summary judgment on a defense for which defendant bears the burden of proof, summary judgment is warranted if plaintiff either (1) produces evidence that negates the

defenses or (2) shows that there is an absence of evidence to support them.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## A. Duress

In his amended answer and at his deposition, defendant represents that he was under duress when he signed the Note and Guaranty because he was "the [sole] provider for his family and not only needed to provide for his own household, but also was under duress as a means for his employees at the time to provide for their families," and under "a lot of pressure by JHTNA."  (Seaberg's Am. Answ. (dkt. #34) 8;  Seaberg 7/31/19 Dep. (dkt. #46) 36.)  Seaberg further testified at his deposition that JHTNA threatened to take away his customer accounts and place other sales representatives in his area "to shut [him] down."  (Seaberg 7/31/19 Dep. (dkt. #46) 37-39, 41.)  During his deposition, however, Seaberg could not point to any specific statements JHTNA allegedly made to force him to sign the Note or Guaranty, rather he simply testified that he felt threatened.  (*Id.* at 47-49.)

"Duress involves wrongful acts . . . that compel a person to manifest apparent assent to a transaction without his volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction."  *Wurtz v. Fleischman*, 97 Wis. 2d 100, 110, 293 N.W.2d 155, 160 (1980) (internal citation and quotation marks omitted). To prove economic duress, defendant must show that:  (1) "he has been the victim of a wrongful or unlawful act or threat"; (2) "[s]uch act or threat must be one which deprives the victim of his unfettered will"; and (3) as a result of the first two elements, "the party threatened must be compelled to make a disproportionate exchange of values or to give up

something for nothing." *Id.* at 109, 293 N.W.2d at 160.

Here, Seaberg has failed to put forth evidence from which a reasonable jury could conclude that JHTNA acted wrongfully or threatened Seaberg to induce him to sign the Note or Guaranty. Seaberg's testimony certainly supports a finding that JHTNA required Seaberg to sign both in order to continue as a dealer, finance new inventory and forebear its right to seek immediate payment on the half of million dollars owed by Grow Fitness at that time, but "threats to do what the threatening person has a legal right to do, do not constitute duress." *Wurtz*, 97 Wis. 2d at 110, 293 N.W.2d at 160; *see also Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201, 203 (Ct. App. 1985) ("A threat to do what the person making the threat has a legal right to do does not constitute duress; nor does driving a hard bargain or taking advantage of another's financial difficulty.").

Moreover, as for the second element, defendant has also failed to put forth evidence from which a reasonable jury could conclude that JHTNA's actions deprived him of his "unfettered will." *Wurtz*, 97 Wis. 2d at 109, 293 N.W.2d at 160. The record reflects that Seaberg was communicating willingly with JHTNA, and in these email communications, he did not express unwillingness to sign the documents or commit to the obligations; indeed, he thanked Draves after he had received the note. (Draves Decl., Ex. B (dkt. #44-2).) Seaberg also testified at his deposition that he could have sold other companies' fitness machines, but made a business decision to continue to sell JHTNA's machines. (Seaberg 7/31/19 Dep. (dkt. #46) 40.)

Finally, this defense fails because Seaberg has not demonstrated that he felt "compelled to make a disproportionate exchange of values or to give up something for

nothing." *Wurtz*, 97 Wis. 2d at 109, 293 N.W.2d at 160. By signing the Note and Guaranty, JHTNA agreed not to pursue a collection action on the half million of debt Grow Fitness owed JHTNA, permitted Grow Fitness to continue as a dealer and continued to provide financing for new inventory.

For these reasons, the court concludes that the undisputed record forecloses a reasonable jury from finding economic duress.

## B. Unconscionability

Seaberg also hints at an unconscionability defense in his answer. Unconscionability is "the absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party." *Wis. Auto Title Loans*, 2006 WI 53, ¶ 32. The defense requires a showing of "both procedural and substantive unconscionability," but these requirements are considered together: "[t]he more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Id.* ¶ 33.

Procedural unconscionability concerns "whether there was a real and voluntary meeting of the minds of the contracting parties." *Id.* ¶ 34 (internal citation and quotation marks omitted). In making this determination, "factors to be considered include, but are not limited to, age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract." *Id.* ¶ 34.

Here, while there is no dispute that JHTNA drafted the documents, Seaberg fails to introduce evidence demonstrating that there was a lack of "real and voluntary" meeting of the minds about its terms. To the contrary, the undisputed evidence demonstrate that Seaberg had worked in the fitness equipment industry for his entire career, specifically testifying that it is "all [he has] ever known." (Seaberg 7/29/19 Dep. (dkt. #45) 43.) Moreover, Seaberg and another business partner had operated another fitness equipment business for years before Seaberg started Grow Fitness. Finally, Seaberg opted to sell JHTNA products exclusively, recognizing that this was uncommon in the industry, rather than diversifying his supplier base. This evidence all weighs against a finding of procedural unconscionability.

"Substantive unconscionability addresses the fairness and reasonableness of the contract provision subject to challenge." *Wis. Auto Title Loans*, 2006 WI 53, ¶ 35. In his opposition brief, Seaberg stated, "[t]he contract terms were unreasonably favorable to the plaintiff. Fitness equipment, with no definite value, in exchange for money, plus 6% interest." (Seaberg's Opp'n (dkt. #60) 3.) The Note and Guaranty, however, simply required Grow Fitness to pay the $500,000 in debt Grow Fitness had accumulated; there is no mention of these payments being contingent on the sale of equipment, though practically speaking that was both parties' hope. Even so, Seaberg fails to explain how the parties' overall business arrangement was unfair to defendant. Seaberg also mentions the 6% interest, but there is no credible argument that a 6% annual interest rate constitutes

usury or is otherwise suspect.[9]  *See, e.g.*, *Matter of Minges' Estate*, 70 Wis. 2d 734, 736, 235 N.W.2d 296, 297 (1975) (affirming award of outstanding principal and annual interest rate of 6%, provided in the agreement, in breach of contract claim).

Here, too, the court concludes that Seaberg has failed to present sufficient evidence from which a reasonable jury could find that the Note and/or Guaranty were unconscionable.

## III. Next Steps

In light of these findings, the court will grant plaintiff's motion for summary judgment on its breach of guaranty claim against defendant Seaberg, finding Seaberg violated the terms of the agreement by failing to honor the terms of the Guaranty in response to JHTNA's June 2017 notice, but will await a finding as to the amount of damages due because of this breach.  In addition to the damages for this claim, there are two additional outstanding issues: (1) whether plaintiff seeks to obtain a default judgment against the former entity Grow Fitness; and (2) whether plaintiff wishes to pursue its tort claims, as alleged in the complaint.[10]

On or before January 17, 2020, plaintiff should submit an accounting reflecting the current amount due under the Note as of January 15, 2020, after all payments, credits and

---

[9] Seaberg faults plaintiff for not conducting a "credit check" or otherwise "vetting his financials." (Seaberg Opp'n (dkt. #60) 2-3.)  While these facts may be relevant if plaintiff were to pursue a tort claim, plaintiff's failure to ensure defendant's ability to pay does not factor into a breach of contract claim.

[10] In its most recent filing, plaintiff indicates that it intends to withdraw its remaining claims.  (Dkt. #70.)

interest are adjusted.  Seaberg then has until January 24, 2020, to object.  The court will

hold a telephonic conference with the parties on January 31, 2020, at 10:00 a.m. CST to

discuss next steps.[11]

---

[11] On December 16, 2019, defendant Seaberg filed a motion for change of venue, citing 28 U.S.C. § 1391 in support.  There are several problems with this motion.  To the extent Seaberg is challenging whether venue in this court is proper, he failed to raise this defense timely, and has, therefore, waived it.  Fed. R. Civ. P. 12(b).  Moreover, Seaberg's representation of the language in § 1391 is incorrect.  That provision does *not* require that the defendant reside in the judicial district where the civil action was brought *and* that a substantial part of the events occurred in that same judicial district.  Instead, the requirement is disjunctive:  a plaintiff can file a lawsuit in a judicial district *either* where the defendant resides *or* where a substantial part of the events or omissions giving rise to the claim occurred.  *See* 28 U.S.C. § 1391(b).  To the extent Seaberg is requesting that the court transfer venue pursuant to 28 U.S.C. § 1404, that request is denied.  While Florida may be more convenient for Seaberg, plaintiff is located in this district.  Moreover, given the procedural posture of this case -- having been filed in 2017, stayed during Seaberg's bankruptcy case, with dispositive motions fully briefed and decided by this court, and with a trial set for February 2020 -- it is simply too late to transfer the case.

ORDER

IT IS ORDERED that:

1) Plaintiff Johnson Health Tech North America, Inc.'s motion for partial summary judgment (dkt. #42) is GRANTED as to liability and RESERVED as to damages.

2) Defendant Matthew Seaberg's motion for leave to file a sur-reply (dkt. #64) is GRANTED.

3) Defendant's motion to transfer to middle district of Florida (dkt. #68) is DENIED.

4) On or before January 17, 2020, plaintiff should submit an accounting reflecting the current amount due under the Note as of January 15, 2020; defendant's objections are due on or before January 24, 2020.

5) The court will hold a telephonic conference with the parties on January 31, 2020, at 10:00 a.m. CST. Plaintiff to coordinate call to Chambers at 608-264-5087.

Entered this 7th day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge